UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 4:11CR263 RWS |
| JAMES L. MILLINER, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The above matter was re-referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed motions to suppress, including a motion to suppress evidence obtained from the search and seizure of his home. The undersigned held an evidentiary hearing on Defendant's motions on May 6, 2013, and ordered a transcript of the proceedings. After the transcript was filed on May 8, 2013, the attorney for the United States filed a post-hearing brief on May 22, 2013, and the Defendant filed a brief in reply on June 13, 2013.

Based upon the evidence adduced at the hearing on the motions to suppress, as well as a review of the transcript of the hearing in this matter and the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law as to the motion to suppress evidence obtained from the search and seizure of his home:

### Findings of Fact

An initial application was filed on March 8, 2011 before Frederick R. Buckles, United States Magistrate Judge, requesting that he issue a warrant to search the Defendant's address at

304 Northridge Place, Wright City, Missouri. After reviewing the affidavit attached to the application, Judge Buckles found probable cause and issued a warrant to search the premises on March 8, 2011. Later, on March 21, 2011, the same agent filed an application before a second magistrate judge requesting a warrant to search the premises at 304 Northridge Place, Wright City, Missouri. It was explained that the initial warrant had not been executed within ten days and, thus, there was a need to request a second warrant approximately two and a half weeks after the first warrant was issued. The affidavit for the second warrant was exactly the same as the affidavit for the fist warrant. After reviewing the warrant, the second magistrate judge also issued the warrant to search 304 Northridge Place, Wright City, Missouri, on March 21, 2011.

The affidavit stating probable cause for the issuance of the warrant is thirty-nine pages in length, and describes in detail the drug operations of Charles McRoberts and his organization. The affidavit relies on several confidential informants, all of whom have been corroborated as reliable in several respects. Further, the information of the various informants corroborates each other and, at least, as to some informants, involves hand-to-hand purchases of crack cocaine set up by McRoberts and completed by his co-conspirators. The affidavit states that McRoberts was in overall control of a large cocaine distribution network in which his main co-conspirators and salesmen were Halesha Bradshaw, Christopher Adams, Antwaun Nunn, Michael Rogers, and James Milliner. (Aff. ¶¶ 8, 10) A source of information also said that Milliner acted as an enforcer in the McRoberts' organization. (Aff. ¶ 16) The sources of information who conveyed this information to DEA were close confidantes of McRoberts for several years. (Aff. ¶ 16) As to the Northridge apartments, monitoring of wiretaps indicated that after Halesha Bradshaw stopped selling cocaine for McRoberts, he recruited, among others, an individual named Adams and an

2

individual named Nunn to be his front men for sale of cocaine.  Although McRoberts directed the overall operation of the ring, he did not touch the cocaine itself.  Further, interceptions of the target telephones as well as conventional investigation specifically revealed that McRoberts was involved in directing Barnes, Adams, Milliner, Rogers, and Nunn in the sale of cocaine. (Aff. ¶ ¶ 26-31, 33)  The wiretaps also revealed that McRoberts was directing individual purchasers of cocaine to the Northridge Apartments, and according to the affidavit, specifically apartments 4 and 5 which were apartments of Nunn and Milliner to complete cocaine transactions. (Aff. ¶ ¶ 10, 26-31, 33)  This was particularly true after Bradshaw stopped selling cocaine for McRoberts, and the sales evolved to Adams and Nunn.  When Nunn became the front man for the cocaine, McRoberts would direct individuals to Nunn's apartment or to Milliner's apartment to complete the transactions.  Specifically, on January 28, 2011, a call was intercepted in which McRoberts told Nunn to sell an individual $50 worth of cocaine.  He told Nunn to go to James's apartment to obtain the cocaine.  The context of the conversation makes it clear that the "James" that he was talking about was James Milliner, as the transaction took place in the Northridge Apartments, and the only James living there who was part of the drug conspiracy was Milliner.  Further, on February 8, 2011, a conversation was intercepted between McRoberts and an individual named Jerry Snodgrass in which Snodgrass was attempting to purchase crack cocaine from McRoberts.  McRoberts told Snodgrass to pull into the Northridge Apartments, and the sale would be completed.  McRoberts then called Nunn and described Snodgrass's vehicle (a red truck), and told Nunn in coded language to obtain the cocaine from Milliner and sell it to Snodgrass.  Further, according to the affidavit, phone calls intercepted during January and February, 2011, revealed that McRoberts was storing crack cocaine in Milliner's apartment at 304 Northridge Place,

3

Wright City, Missouri. (Aff. ¶¶ 26-31, 33, 42, 42E, 43) The affidavit states that the wiretap revealed that, on occasion, McRoberts is overheard directing Nunn to sell cocaine to various individuals, which cocaine is either stored at Nunn's apartment or at Milliner's apartment. In addition, agents observed McRoberts' vehicle parked in front of Nunn's apartment and Milliner's apartments on numerous occasions. On February 8, 2011, agents observed Milliner, Nunn, and McRoberts in Milliner's apartment together. (Aff. ¶¶ 26-31, 33, 42, 42E) It should be noted that it was this date that the above sale to Snodgrass was completed in which McRoberts told Nunn to go to Milliner's apartment to obtain the cocaine to complete the purchase. (Aff. ¶¶ 26-31, 33) In addition, McRoberts is overheard admonishing one of his distributors for selling cocaine on his own, and tells him because McRoberts can not trust the seller, McRoberts will tell Milliner to no longer assist the person in the sale of cocaine. (Aff. ¶ 44). Further, Milliner is intercepted on the wiretap on numerous occasions setting up purchases of cocaine. (Aff. ¶ 43)

## Conclusions of Law

A. Probable Cause for the Search Warrant

For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found at the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

4

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . .

Brinegar v. United States, 338 U.S. 160, 175 (1949).

Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context--not readily or even usefully reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." See Gates at 232. Probable cause may be based on the totality of the circumstances present. All that need be shown for probable cause to search is that there be a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. See Illinois v. Gates, supra. Probable cause can also be based on the word of a reliable informant with or without corroboration, or based on anonymous tips or information from third parties to an informant, as long as that information is corroborated. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984); United States v. Ketzeback, 358 F.3d 987 (8th Cir. 2004); United States v. Carmichael, 489 F.2d 979 (7th Cir. 1972). It is also not uncommon that search warrants are issued when there is no direct evidence that drugs or other contraband, such as money, are stored at a defendant's home. Nevertheless, courts have upheld search warrants based on probable cause on the basis of inferences involved from the facts in these cases, as well as the informed opinions and experiences of experienced drug agents in these matters. See United States v. Grossman, 400 F.3d 212 (4th Cir. 2005). In Grossman, supra, the Court upheld a search of a home for drug evidence even though there was no evidence the drugs were stored in the defendant's house, as

follows:

> Our precedent provides guidance in this regard. In <u>United States v. Williams</u>, following a routine traffic stop, officers obtained a search warrant for the defendant's motel room. . .The warrant was issued on the basis of an affidavit which established (1) that Williams had a criminal history involving drug trafficking, (2) that his car contained drug residue and a concealed knife, and (3) that he was carrying a receipt for a motel room. *Id.* at 480-81. Williams--like Grossman--argued that this evidence did not establish a probability that drugs would be found in the motel room. *Id*. at 481. He argued that nothing existed to link his past drug-related activities to his current motel room. We disagreed. *Id.*
>
> Indeed, our cases indicate that a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant "contains no factual assertions directly linking the items sought to the defendant's residence."
>
> The same logic controls here. Under these circumstances, it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key.

400 F.3d 212, 217, 218.

In <u>United States v. Burton</u>, 288 F.3d 91 (3rd Cir. 2002), the Court dealt with whether or not direct evidence of drug-dealing activity was needed in order to authorize a search warrant. In holding that it was not, the Court stated as follows:

> Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested.

288 F.3d 91, 103.

In holding that the affidavit was sufficient, the Court took cognizance of the agent's expertise in deducting from facts known to him whether or not a particular location involved a "stash house" in which drugs and large amounts of currency might be kept. In so holding, the Court stated as follows:

6

> Lastly, the McEwen affidavit also contained the experiences of Officer McEwen, a five-year veteran of the Task Force, that "[p]ersons involved in large-scale drug trafficking and those who assist them frequently conceal in locations known as 'stash houses' caches of drugs, drug paraphernalia, firearms, large amounts of currency," and other evidence of drug dealing. His affidavit suggests, based on his experience and training, that 2543 North Garnet Street was such a stash house. Given the evidence possessed by the Task Force and taken in light of Officer McEwen's training and experience, we believe his conclusion to be well supported, even without resort to the drug paraphernalia discovered in the Task Force's earlier quick sweep of the property.

288 F.3d 91, 104.

Based on the above law, the undersigned concludes that there was more than sufficient probable cause to search the premises at 304 Northridge Place in Wright City, Missouri. Numerous informants had stated that Milliner was involved in drug trafficking with McRoberts, and on at least two occasions, drug salesmen for the McRoberts' organization were directed to Milliner's apartment in order to obtain drugs for sale. Further, on numerous occasions, Milliner had purchased cocaine from various individuals involved in the drug operation. This, along with the agent's opinion that individuals who assist drug dealers frequently conceal caches of drugs, drug paraphernalia, and cash in their residences, provides probable cause to search the residence. This is particularly true when the officer, as is true in this case, was an experienced officer. As in United States v. Burton, supra, the affidavit in this case states as follows:

> I have had extensive experience, as have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking. Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive distribution conspiracies involving large amounts of controlled substances and money, I know the following:

7

a. It is common for large-scale dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence. . .It is also common for these records to be maintained over a period of time.

b. Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of drugs. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances. . .The aforementioned. . .are maintained where the drug traffickers have ready access to them, specifically in their residence. . .It is common for these records to be maintained for a substantial period after the transactions have taken place.

d. Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;. . . answering machines; address and/or telephone books . . .These records are maintained. . .in their residence. . .

. . .

f. Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property. . .

. . .

i. Evidence of occupancy and residence, including but not limited to, utility and telephone bills, canceled envelopes. . .

j. Drug traffickers frequently possess firearms and/or other weapons in their residence. . .

. . .

Based on the facts as construed by my training and experience and the training and experience of the investigative team, presented in the affidavit set forth, I have probable cause to believe that evidence as set forth in the attached "list" of the

drug trafficking organization is contained within the above listed locations.
See Government's Exhibit C, pgs. 36-39 .

All of the above supports the magistrate judge's conclusion that drugs and drug paraphernalia and documents were likely to be found in Milliner's premises. The present case is very similar to United States v. Burton, supra.

### B. Good Faith

Although the undersigned concludes that there was probable cause for issuance of the search warrant, alternatively, the agents acted in good faith in relying on the warrant. In United States v. Leon, 468 U.S. 897 (1984), police officers obtained evidence pursuant to what appeared to be a valid search warrant. The warrant, however, was later found to be defective for lack of probable cause. Nevertheless, the Supreme Court held that the evidence seized was admissible because the officers had reasonably relied on the magistrate's determination that the warrant was supported by probable cause. The Court reasoned that the "good faith" exception to the exclusionary rule was followed because suppressing evidence obtained pursuant to a valid warrant that the police reasonably believed to be lawful would not advance the purpose of the exclusionary rule. The good faith exception applies when police obtain evidence in reliance on a warrant later found to be defective and lacking in probable cause, or because there was a technical error. The Supreme Court determined that searches pursuant to a warrant will rarely require any inquiry into reasonableness, and that a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting his or her search. United States v. Ross, 456 U.S. 798, 823 n.32 (1982); Illinois v. Gates, 462 U.S. at 267.

In addition, the Court provided detailed guidance to define those very limited situations in which a reliance on a warrant would not justify suspension of the "extreme sanction of exclusion." United States v. Leon, supra at 916. Those limited situations include: (1) the judge was misled by false information in the affidavit that the affiant knew or should have known was false; (2) the issuing magistrate wholly abandoned his judicial role and did not serve as a neutral and detached actor, but was rather a rubber stamp for the police; (3) where a warrant is based on an affidavit so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable, and (4) infirmities in the warrant contain technical errors. See United States v. Carpenter, 341 F.3d 666, 670-673 (8th Cir. 2003).

Comparing the first infirmity in Carpenter, supra, to the present case, the undersigned concludes there is no allegation made by the Defendant nor is there any evidence to indicate that anything in the affidavit in the case now at bar is false in any manner. Therefore, this exception does not apply.

As to exception (2), that the magistrate judge was not acting in an independent manner, the Defendant does allege that the magistrate judge here was a rubber stamp for the prosecutor. The undersigned concludes that this contention has no merit based on the amount of information involving Milliner, including specific references to his apartment, and Milliner's wiretapped conversations in which he sets up purchases of cocaine. In addition, the undersigned notes that this warrant was reviewed by two separate magistrate judges and probable cause was found by both of them. Thus, the Defendant is evidently alleging that both of the magistrate judges who independently reviewed the affidavit were merely rubber stamps for the Government. The undersigned rejects this analysis.

As to the third situation described by the Court in Leon, the undersigned concludes that the affidavit does show probable cause, and, at any rate, there was nothing in the affidavit that would render any officer's belief about the objective good faith reliance on the warrant to be entirely unreasonable.  In United States v. Carpenter, supra, an officer in the Minneapolis police department filed an affidavit in which he alleged that a female named Christie, who his informant knew quite well, was currently in possession of an amount of methamphetamine in excess of an amount that would be considered personal use.  The informant described Christie's age, weight, and hair, and said that she had a history of narcotics possession and use, and numerous prior narcotics related arrests and convictions.  The informant did not say that he had seen the narcotics in Christie's residence, nor did he explain exactly how he knew that Christie was in possession of the methamphetamine.  The officer was able to verify many of the details which the informant gave to him about Christie, including her description and her prior convictions.  The defendant nevertheless challenged the affidavit, stating that the affidavit was so lacking in the indicia of probable cause as to render the officer's good faith belief entirely unreasonable.  Reviewing the affidavit, the Court held that "entirely unreasonable" was a difficult standard for the defendant to meet.  Even though the Court determined that probable cause likely did not exist, the Court nevertheless held as follows in determining that the evidence should not be suppressed:

> Viewing the cumulative effect of these infirmities, as we must, we see a series of unrelated shortcomings that may demonstrate an absence of probable cause.  We also see, however, that the cumulative effect of information set forth in the affidavit provides an adequate basis for finding that Officer Shoemaker's reliance was reasonable.

341 F.3d 666, 670,

In addition, the Defendant alleged that the officer's failure to set forth in a detailed manner the factual basis for the informant's statement that Christie possessed drugs likewise negated good faith. The Court stated as follows in this regard:

> All that the affidavit stated in this regard was that the CRI had a relationship with Christie "where [ ] the CRI could know such detailed information regarding 'Christie's narcotic's [sic] dealings.'" Carpenter argues that the CRI's statement is an unsupported conclusion expressed through the affiant and that the Supreme Court rejected this type of unsupported statement in *Aguilar*. . .
>
> In rejecting this argument, the Court went on to state:
>
> Because, under *Leon*, we do not conduct a de novo review of the probable cause determination, we need not parse this distinction more finely. It is sufficient to note that Carpenter raises a close question concerning a legal deficiency. On such issues, officers may reasonably rely on the judgment of the issuing magistrate. We note, in addition, that *Aguilar*, as a rule of law standing on its own has been superseded by *Gates* totality of the circumstances approach.

341 F.3d 666, 671.

Thus, the undersigned concludes the much more conclusory and less detailed statements in Carpenter are held sufficient to satisfy good faith. The statements in the current case, although somewhat conclusory in some respects, also contain detailed corroborated information from informants and wiretaps involving at least a few specific transactions relating to the Defendant and his apartment. They are much more definitive than statements found to be sufficient in Carpenter, supra. In addition, Carpenter alleges that there is no real connection between the possession of narcotics and the possession in Christie's house. In this regard, the Court stated:

> As a matter of common sense, it is logical to infer that people in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence. Given the common sense appeal of this inference, and its

12

acceptance by the issuing magistrate, it was not entirely unreasonable for Officer Shoemaker to believe the inference to be permissible.

341 F.3d 666, 671, 672.

In the case now at bar, much of the narcotics activity revolves around residences 4, 5, and 6, one of which is the Defendant's residence. In addition, a common sense reading of the wiretap transcript by the agent who was familiar with all the voices and the slang used in the narcotics operation, lead the agent to conclude that Milliner possessed narcotics or narcotics paraphernalia on his premises. The undersigned draws the same conclusion based on the affidavit.[1]

---

[1] In determining whether an investigating officer, Agent Lawyer in this case, had "an objectively reasonable belief in the existence of probable cause," the Court must "look to the totality of the circumstances, including any information known to the officer, but not presented to the issuing judge." United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011). As detailed by the Government, the facts known to Special Agent Lawyer but not specifically presented to the Court included the following specific information relating to the Defendant's apartment. Agent Lawyer testified at Milliner's first trial that Milliner's role in the drug-trafficking organization included counter-surveillance. Agent Lawyer also testified that on December 29, 2010, a confidential source purchased crack cocaine from Christopher Adams at the Northridge apartments. Christopher Adams walked directly out of Milliner's apartment and met with the CI in the parking lot of the apartments in order to complete the transaction. Agent Lawyer also testified at the trial that a call was intercepted on the wiretap during which Charles McRoberts told Antwaun Nunn to get $50 worth of crack cocaine from Milliner's apartment. During the call, Nunn handed the phone to Milliner, and McRoberts asked Milliner whether Milliner had obtained the $300 for the sale of the cocaine. Milliner told McRoberts that he was counting the money. During another call between McRoberts and Milliner on February 4, 2011, Agent Lawyer testified that Milliner told McRoberts he was preparing the crack cocaine for sale. Surrounding phone calls and their analysis revealed that Milliner was at his apartment at the time he made this statement. Further, during the course of his testimony, Agent Lawyer testified that Milliner was storing both crack cocaine and money at his apartment in early February, 2011.

Based on the above, the undersigned concludes that Agent Lawyer's personal knowledge and information that Milliner was deeply involved in McRoberts' drug trafficking organization, and that some of the items of evidence would likely be located at his apartment, made Lawyer's belief, that the search warrant was valid, objectively reasonable. Therefore, the evidence should not be excluded on this basis.

13

## Conclusion

Therefore, based on the above, the Defendant's Motion to Suppress Evidence Obtained from the Search and Seizure of His Home should be denied.

* * *

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained from the Search and Seizure of His Home [ECF No. 536] be **denied**.

Further, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

        /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of July, 2013.